# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| K.S., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION FILE NO.: |
| | : | |
| v. | : | _____ |
| | : | |
| | : | **JURY TRIAL DEMANDED** |
| HARE KRISHNA DECATUR | : | |
| HOTEL, LLC d/b/a MOTEL 6; | : | |
| SHIV GLOBAL HOTEL, LLC d/b/a | : | |
| KNIGHTS INN; and | : | |
| TRINITY SNK CORPORATION | : | |
| f/k/a GLOBAL MANAGEMENT & | : | |
| INVESTMENT CORPORATION, | : | |
| | : | |
| Defendants. | : | |

---

## COMPLAINT

---

Matthew B. Stoddard
Carson L. Wynn
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
matt@legalhelpga.com
carson@legalhelpga.com

**Attorneys for Plaintiff**

1

# TABLE OF CONTENTS

Introduction ........................................................................................................3

Procedural Issues................................................................................................5

K.S. is Trafficked for Sex..................................................................................7

    i.    The Knights Inn .......................................................................11

    ii.    The Motel 6 ............................................................................14

Defendants' Extensive Knowledge of Trafficking at the Knights Inn & Motel 6…15

Defendants had Constructive Knowledge that K.S. was Being Trafficked ............20

TVPRA Beneficiary Claims................................................................................24

Causation and Damages .....................................................................................28

Prayer for Relief................................................................................................29

## **INTRODUCTION**

1.      This case arises out of the sex trafficking of Plaintiff K.S. at two hotels in DeKalb County, Georgia.

2.      While these hotels are legally owned by separate entities, the same ownership group owns both hotels, and this group used the same corporate affiliate to manage both properties at all relevant times in this Complaint.

3.      The first hotel at issue is the Knights Inn, which is located at 2859 Panola Road in Lithonia, Georgia, 30058 (the "Knights Inn").

4.      At all relevant times, Defendant Shiv Global Hotel, LLC ("Shiv Global") owned, operated, and managed the Knights Inn.

5.      The second hotel at issue is the Motel 6, which is located at 2572 Candler Road in Decatur, Georgia, 30032 (the "Motel 6").

6.      At all relevant times, Defendant Hare Krishna Decatur Hotel, LLC ("Hare Krishna") has owned, operated, and managed the Motel 6.

7.      At all relevant times, Defendant Trinity SNK Corporation, formerly known as Global Management & Investment Corporation ("Global Management") assisted Defendant Shiv Global in operating and managing the Knights Inn and Defendant Hare Krishna in operating and managing the Motel 6.

8. While it was in operation, the Knights Inn was well-known for the illicit activity, including the rampant sex trafficking and prostitution, occurring at the hotel.

9. The Motel 6 is still in operation and has been a notorious hotspot for illicit activity that has been attracting sex trafficking and prostitution ventures for years.

10. K.S. was trafficked for sex at the Knights Inn from approximately May 1, 2015, through September 30, 2017, and at the Motel 6 from approximately November 1, 2015, through September 30, 2017, by a man she knew as "Shaun" and his associates.

11. The trafficking period of K.S. began when she was only 16 years old and lasted until after she turned 18 years old.

12. Prior to K.S.'s trafficking, Defendants were on notice about the prevalence of sex trafficking and prostitution occurring at the Knights Inn and the Motel 6. Such notice came through publicly available information (such as the online reviews for the hotels) and law enforcement activity at the hotels.

13. Despite Defendants' knowledge, Defendants refused to take any action to prevent or deter sex trafficking.

14. In addition to their longstanding awareness that rooms at their properties were routinely used for sex trafficking ventures, Defendants had

4

constructive knowledge that K.S. was being trafficked at the Knights Inn and the Motel 6 during the period of May 1, 2015, through September 30, 2017.

15.    In the face of clear warning signs and repeated indicators of trafficking activity, Defendants chose to ignore K.S.'s situation and continued to rent rooms to K.S.'s trafficker, and K.S. herself, so that the trafficking could continue.

## PROCEDURAL ISSUES

16.    Given the nature of this case, K.S. is identified in this Complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel has either previously disclosed K.S.'s full name to defense counsel or will immediately upon identification of, and request by, defense counsel. Contemporaneously with this Complaint, Plaintiff filed a Motion for Protective Order seeking this Court's permission to proceed anonymously. Upon information and belief, Defendants will consent to K.S. proceeding without publicly disclosing her name.

17.    Plaintiff K.S. is a resident of Newton County, Georgia, and she consents to the jurisdiction of this Court.

18.    Defendant Shiv Global is a Georgia limited liability company with its principal place of business located at 2030 Avalon Parkway, Suite 200, McDonough, Georgia, 30253.

19.    Defendant Shiv Global can be served through its registered agent, Joel M. Haber, at 2030 Avalon Parkway, Suite 200, McDonough, Georgia, 30253.

20. Defendant Shiv Global was properly served with process in this matter.

21. Defendant Shiv Global is subject to the jurisdiction and venue of this Court.

22. Defendant Hare Krishna is a Georgia limited liability company with its principal place of business located at 2030 Avalon Parkway, Suite 200, McDonough, Georgia, 30253.

23. Defendant Hare Krishna can be served through its registered agent, Joel M. Haber, at 2030 Avalon Parkway, Suite 200, McDonough, Georgia, 30253.

24. Defendant Hare Krishna was properly served with process in this matter.

25. Defendant Hare Krishna is subject to the jurisdiction and venue of this Court.

26. Defendant Global Management is a Georgia for profit corporation with its principal place of business located at 2030 Avalon Parkway, Suite 200, McDonough, Georgia, 30253.

27. Defendant Global Management can be served through its registered agent, Joel M. Haber, at 2030 Avalon Parkway, Suite 200, McDonough, Georgia, 30253.

28. Defendant Global Management was properly served with process in this matter.

29.     Defendant Global Management is subject to the jurisdiction and venue of this Court.

30.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question jurisdiction) because this matter concerns the Trafficking Victims Protection Reauthorization Act (the "TVPRA"), which is a law of the United States.

31.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in DeKalb County, Georgia, which is within the Northern District of Georgia's Atlanta Division. *See* 28 U.S.C. § 1391.

## K.S. IS TRAFFICKED FOR SEX

32.     During the majority of the period that K.S. was trafficked for sex at Defendants' hotels, she was a minor.

33.     In approximately 2015, K.S. began talking on social media with a man who she knew as "Shaun."

34.     Shaun convinced K.S. that she should come over and stay with him, and they could make money together.

35.     K.S. was only 16 years old at the time, and Shaun did not mention to K.S. that she would be sold for sex.

36.     K.S. agreed to meet up with Shaun, and she stayed with him for a night in a hotel room.

37. The next day, Shaun informed K.S. that she needed to make money to pay for the hotel room they were in; Shaun explained to K.S. that she would do this by being sold for sex to different customers or "johns" as they are commonly called.

38. K.S. immediately told Shaun that she did not want to be sold for sex, and she requested that he take her back home.

39. Shaun told K.S. that he would not be taking her anywhere, and he demanded that she participate in two "plays," which is the term for a commercial sex transaction, to pay for the hotel room.

40. Shaun then took 16-year-old K.S. to meet with an older woman who took pictures of her to post on internet sites, such as Backpage.com, and "showed her the ropes" on selling sex for money.

41. Between approximately May 1, 2015, and September 30, 2017, K.S., who was between 16 and 18 years old, was forced to have sex for money.

42. K.S.'s trafficker, Shaun, used the Knights Inn regularly from approximately May 1, 2015, to September 30, 2017, for sex trafficking K.S., and he used the Motel 6 regularly from approximately November 1, 2015, to September 30, 2017, for sex trafficking K.S.

43. Shaun often kept K.S. at the Knights Inn during the weekdays and the Motel 6 on the weekends.

44. Upon information and belief, Shaun had previously used Defendants' hotels for trafficking young women, and during the period he was trafficking K.S. for sex, he was also using Defendants' hotels to traffic additional young girls and women.

45. Shaun and his associates rented rooms at the Knights Inn and the Motel 6 from Defendants for use in trafficking K.S.

46. Defendants collected revenue from the rental of rooms to Shaun and his associates in which K.S. was forced to have sex multiple times a day.

47. Shaun took the money K.S. made from the sex acts, and he would use the funds, in part, to rent or re-rent the hotel rooms at the Knights Inn and the Motel 6.

48. After the original room rental, Shaun or K.S. would go to the front desks of the hotels each day during their stays to pay for the renewal of the room using funds from the commercial sex acts.

49. As long as K.S. had the room key and cash, Defendants did not require any identification from K.S., including when she was a minor, and Defendants did not ask her any questions.

50. Upon information and belief, Shaun would use Defendants' Wi-Fi networks to communicate regarding the sex trafficking venture generally. In this

way, Defendants' property and internet services directly facilitated the ongoing trafficking venture.

51.    Upon information and belief, Shaun paid for the use of Defendants' Wi-Fi networks through either the room rental fees or as a separate charge.

52.    Shaun required K.S. to complete a certain number of plays each day at Defendants' hotels. It began with two and quickly increased to five, ten, and twelve plays a day.

53.    At some point, Shaun began requiring K.S. to earn a minimum of $300 a day from commercial sex acts.

54.    K.S. requested to stop being sold for sex on at least three occasions after the trafficking began.

55.    The first request was after about two or three weeks of being trafficked at Defendants' hotels by Shaun. In response, Shaun physically assaulted K.S. and informed her that she would be allowed to go home when he decided she could go home.

56.    The second time K.S. told Shaun she no longer wanted to be sold for sex he raped her as a punishment for her request.

57.    The third time K.S. told Shaun she no longer wanted to be sold for sex he informed her that he knew where she lived and would find her.

58. Shaun repeatedly told K.S. that if he allowed her to leave the hotels, which he did eventually during the trafficking period, and she failed to return to him, he would find her.

59. Shaun also warned K.S. that she should not "run her mouth" about him.

60. Shaun used violence and the threat of violence to force K.S. to continue to perform sex work at Defendants' hotels.

61. K.S was frightened of Shaun.

62. Shaun also provided K.S. with drugs, such as weed and ecstasy, to increase his control over her while trafficking her.

63. K.S. was forced to have sex for money hundreds of (and likely over a thousand) times with numerous men in rooms at Defendants' Knights Inn and Motel 6.

64. Defendants knew or should have known that the activity associated with K.S. and her trafficker was indicative of commercial sex activity, including minor sex trafficking.

### i. The Knights Inn

65. Shaun used the Knights Inn as the primary venue for trafficking K.S. for sex.

66. K.S. was sold for sex at the Knights Inn up to 12 times per day during each of her stays, resulting in her being sold hundreds of times during the trafficking period.

67. Defendants routinely rented rooms to Shaun and his associates on the second or third floor and on the left side of the hotel in locations intentionally chosen to conceal their sex trafficking activities and to minimize detection by other guests or law enforcement.

68. Defendants would even alert Shaun when the police were on the property, and he would call K.S. to tell her not to answer the door or accept any more plays until he contacted her again.

69. On one occasion, one of Defendants' male employees, who upon information and belief participated in housekeeping duties at the Knights Inn, conveyed a message from Shaun to K.S. after Shaun learned from Defendants that police were on the property; the employee told K.S. to not answer the door or accept any calls until Shaun contacted her directly.

70. K.S., who had signs of physical abuse and was dressed in scantily pajamas, would allow housekeeping in to clean the room, which was littered with condoms, used towels, and lingerie, yet housekeeping asked no questions and simply cleaned up the mess.

71. During the time she was being trafficked at the Knights Inn, K.S. was robbed at gun point at the hotel, raped at gun point at the hotel, and repeatedly beaten by Shaun as well as johns.

72. Once a john pulled out a gun and threatened K.S. in the room, and when the john left, he shot Shaun who was close by and monitoring K.S.'s room.

73. The police were called, but Defendants allowed Shaun and K.S. back at the Knights Inn after the incident.

74. On one occasion at the hotel, K.S. had taken ecstasy and become so paranoid that she ran out of her hotel room naked, but no one did anything to assist her.

75. Shaun was trafficking multiple young girls and women out of the Knights Inn at the same time he was trafficking K.S.

76. Defendants rented Shaun rooms that were either side-by-side or close in proximity so that he could efficiently monitor his trafficking venture.

77. Shaun would go door-to-door collecting money from each of the young girls and women.

78. On one occasion, a young woman who was being trafficked by Shaun was in the room next door to K.S. The young woman was physically assaulted so severely by a john, including being pistol whipped, that she had two black eyes.

79. Because of Defendants' actions, the sex trafficking of K.S. was allowed to continue for over two years.

## ii. The Motel 6

80. Shaun used the Motel 6 as another venue for trafficking K.S. for sex, and he often used it on the weekends because he claimed it was "busier."

81. The frequency of K.S.'s trafficking at the Motel 6 was such that she was sold for sex between six and twelve times per day during each of her stays at the Motel 6.

82. Defendants routinely rented rooms to Shaun and his associates on the third floor, which was intentionally chosen to conceal their sex trafficking activities and to minimize detection by other guests or law enforcement.

83. Johns visiting K.S. at the Motel 6 for commercial sex activity would enter through the lobby to access the room where K.S. was staying.

84. Defendants violated their own policies and procedures by allowing unregistered individuals such as these johns to come and go through the lobby to a specific room without requiring proof of identification or appropriate registration with a room.

85. These unregistered individuals would only stay in the hotel room where K.S. was staying at the Motel 6 for approximately 20-30 minutes and then leave.

86.    The rooms rented by Shaun and K.S. would be left with copious condoms and used towels at checkout.

87.    The Motel 6 even had a reputation of knowingly renting rooms under aliases. For example, a young girl K.S. knew who was also being sold for sex by a pimp needed a room at the Motel 6, but she did not have an ID. The front desk staff provided the friend with an ID that had been left at the hotel and used that name and ID to register the room knowing it was an entirely different person.

## DEFENDANTS' EXTENSIVE KNOWLEDGE OF TRAFFICKING AT THE KNIGHTS INN & MOTEL 6

88.    Defendants knew or should have known of the existence of sex trafficking and its illegality since the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' Palermo Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children.

89.    Defendants knew or should have known that the Atlanta metro-area had a well-publicized reputation as an "epicenter for human trafficking, and particularly child sex trafficking," and as "the number one city for child sex trafficking."[1]

---

[1] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and  Human Trafficking Prevention Month*, Jan. 29, 2015 *available at https://www.justice.gov/archives/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department* (last visited Sept. 12, 2025).

90.    In 2007, the Atlanta metro-area's sex trafficking economy was worth almost $300 million annually with traffickers reporting average *weekly* earnings of roughly $33,000.[2]

91.    Defendants, for a fee, provided a market for the sale of children for sex at their hotels, including for K.S., who was a minor the majority of the time.

92.    Defendant knew or should have known that, compared to other types of businesses,[3] hotels play a critical role in sex trafficking ventures and serve as "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of L.A. v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

---

[2] Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, (March 13, 2014) available at https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited Sept. 12, 2025).

[3] *Cf. Sun Tr. Banks, Inc. v. Killebrew*, 266 Ga. 109, 111 (1995) (Sears, J., concurring) ("[T]he banking industry itself anticipates that criminal activity will frequently occur at ATMs."); *Killebrew v. Sun Trust Banks*, 221 Ga. App. 679, 680-81 (1996) (physical precedent only) ("it would be difficult to say that a criminal occurrence at an ATM is unforeseeable as a matter of law. Indeed, such a conclusion could be reached only by turning 'foreseeability' into a legal term of art totally divorced from its meaning in everyday usage.")

93.    Defendants had actual or constructive knowledge of the publicly available online reviews of the Knights Inn reporting allegations of prostitution and other illicit activities at the Knights Inn. Those reviews included comments such as:

a. "**There were men and prostitutes hanging around** outside of the hotel. . ." (Google, 2015).

b. "There was a **strange guy lurking around in the parking lot** from the time we arrived until the middle of the night. **He appeared to be [a] pimp with prostitutes in a room a few doors down from us**. . .. **Reported guy in parking lot but nothing was done**. . .. People giving this place over 1 star must be part of the **pimps and prostitutes**. . ." (Google, 2016).

c. "There was **a shooting outside my door** the first night there[.]" (Google, 2016).

d. "There are **women selling sex** there. . ." (Google, 2017).

e. ". . . a guy approach[ed] saying **he had pills for sale**. . ." (Google, 2017).

(emphasis added in bold; all other emphasis in original). The reviews quoted in this Complaint, amongst others, will be produced in discovery.

94.    The online reviews provided Defendants with actual or constructive knowledge of sex trafficking, commercial sex, and the foreseeable risk of future sex trafficking ventures at the Knights Inn.

95.    Defendants had actual or constructive knowledge of the publicly available online reviews of the Motel 6 reporting allegations of prostitution and other illicit activities at the Motel 6. Those reviews included comments such as:

a. "It looked like it was frequented by **drug dealers and prostitutes**." (TripAdvisor, January 2010).

b. "My dog picked up a USED **condom from the parking lot**!" (TripAdvisor, September 2012).

c. "I think they **sell drugs** there!" (TripAdvisor, April 2016).

d. "We have experienced. . . **several drug deals in the parking lot**, our room smells like weed. . ." (TripAdvisor, October 2016).

e. "It was very filthy and you could smell drugs. . .. **Not a very safe place at all**. . ." (Google, 2016).

f. "**Unless your** [sic] **accustomed to drug use, prostitution**, drunks and loud people, then drive a little further." (Google, 2016).

g. "[T]he guy house keeper [sic] was a total creeper [sic] **he offered me money for sex** when he was supposed to be cleaning my room and their [sic] was always loud **smells of drugs**. . ." (Google, 2016).

h. ". . . BOTTOM line this joint is a **drug infested place and a highly prostitution** [sic] area." (Google, 2017).

(emphasis added in bold; all other emphasis in original). The reviews quoted in this Complaint, amongst others, will be produced in discovery.

96.    The online reviews even show responses from the purported owner, acknowledging these types of complaints.

97.    The online reviews provided Defendants with actual or constructive knowledge of sex trafficking, commercial sex, and the foreseeable risk of future sex trafficking ventures at the Motel 6.

18

98.    Defendants had actual or constructive knowledge of law enforcement activity reporting widespread illicit activity, including prostitution, occurring at the Knights Inn and Motel 6.

99.    Between the beginning of 2015 and the end of K.S.'s trafficking period around September 30, 2017, there were over 35 incidents at the Knights Inn involving prostitution or pimping. And 12 of those incidents involved the offense of keeping a place of prostitution.

100.    Motel 6 also had issues with criminal activity as 22 wanted persons were located at the hotel between the beginning of 2015 and the end of K.S.'s trafficking period around September 30, 2017, including at least one person who was wanted for a child molestation charge. Furthermore, there were over 30 incidents involving assault or battery and at least two incidents that were identified as prostitution.

101.    Additional details on the criminal activity and notable reports regarding Defendants' hotels are not readily available based on the ability of Plaintiff's counsel to get police reports from law enforcement agencies who served the area without subpoena, but upon information and belief, there will be police reports that contain more notable details regarding the prostitution, sex trafficking, and drug activity at the premises.

102. The police activity at the Knights Inn and the Motel 6 show Defendants were clearly on notice of the illicit activity, including prostitution and sex trafficking, occurring at the properties.

## DEFENDANTS HAD CONSTRUCTIVE KNOWLEDGE THAT K.S. WAS BEING TRAFFICKED

103. Defendants directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at the Knights Inn and Motel 6 at all relevant times giving Defendants knowledge of sex trafficking, including the sex trafficking that victimized K.S., and other crimes at the hotel during the relevant period.

104. During the period she was trafficked at the Knights Inn and Motel 6, K.S. frequently entered the lobbies of Defendants' hotels and approached the front desks. This included entering the lobbies by herself to renew the room rentals Shaun had originally rented after she had received the funds from commercial sex activity occurring within the rooms.

105. Defendants always allowed K.S., even while she was a minor, to re-rent the room without any identification as long as she had the key to the room and cash to pay for the nightly rate.

106. Defendants were able to observe K.S., specifically her age and appearance, each time she came down to re-rent the rooms, but Defendants never asked any questions.

20

107.    Housekeeping at the hotels also had ample opportunity to observe the age and appearance of K.S. as well as the states of the rooms during and after K.S.'s stay. Those rooms would have many used condoms, used towels, and lingerie in them.

108.    Defendants were also able to observe Shaun monitoring K.S. as he would linger near the rooms.

109.    On one occasion at the Knights Inn while Shaun was near the room K.S. was in with a "john," Shaun was shot by the man as he was leaving K.S.'s room.

110.    Moreover, Defendants Shiv Global and Global Management rented rooms to Shaun at the Knights Inn that were side by side or close in proximity to one another, and Shaun could then be seen going to each of the doors to collect money from each of the girls and women in the rooms.

111.    At the Knights Inn, Defendants Shiv Global and Global Management would rent Shaun and his associates the rooms on the second or third floor on the left side of the building to allow for more privacy and to make it more difficult for law enforcement to identify the criminal activity occurring at the hotel.

112.    Defendants Shiv Global and Global Management would even alert Shaun when the police were on the property at the Knights Inn.

113.    On at least one occasion, Defendants Shiv Global and Global Management went so far as to deliver a message from Shaun to K.S. while law

enforcement was on the property; that message was to not answer the door or accept any calls until Shaun contacted her directly.

114. Thus, Defendants Shiv Global and Global Management were aware that an older man was directing K.S., who had clear signs of physical abuse and was dressed in revealing clothing, to not open her door when law enforcement was on the property.

115. Defendants Shiv Global and Global Management also had the opportunity to observe approximately 6 to 12 men per day enter the room where K.S. was staying, stay 20-30 minutes, and then leave.

116. Shaun was providing K.S. with drugs, and during one of her stays at the Knights Inn when she had taken ecstasy, she ran out of her hotel room completely naked for all to see.

117. At the Motel 6, Defendants Hare Krishna and Global Management would rent Shaun and his associates the rooms on the third floor of the building to allow for more privacy.

118. The Motel 6 was set up in a way that required the johns visiting K.S. to come through the lobby and up to her room on the third floor.

119. Defendants Hare Krishna and Global Management allowed upwards of six men a day to enter the hotel lobby and proceed to the third floor without proof of room rental. Those men would only stay 20-30 minutes before leaving the hotel.

22

120. As shown above, Defendants had ample opportunity to observe the numerous, well-known and visible signs of a sex trafficking victim that K.S. exhibited during the period she was trafficked. These included, but were not limited to:

    a. K.S. was visibly young and the men she was with were much older than her;

    b. K.S. was frequently wearing clothing that was inappropriate for her age, including scant or revealing clothing;

    c. K.S. was malnourished and had signs of drug use;

    d. K.S. often had signs of physical injury;

    e. There was heavy foot traffic to, from and in front of the rooms where K.S. was staying, with adult men entering and staying 20-30 minutes before leaving the premises entirely;

    f. K.S.'s trafficker and his associates would rent rooms by the day, always paying in cash;

    g. K.S., who was a young girl, would even come down to the lobby to rent the room by the day and paid in cash;

    h. The rooms where K.S. stayed were filled with used condoms, used towels, and lingerie; and

    i. K.S.'s trafficker, Shaun, stayed near K.S. and monitored her while she was on the properties.

121. K.S.'s victimization followed a pattern that was readily observable and should have been obvious to hotel employees based on information available to the

23

public at large and to the hotel industry, and consequently, Defendants and their employees and agents had constructive knowledge of K.S.'s sex trafficking.

122.  Rather than taking reasonable steps to prevent sex trafficking, Defendants – in the quest for profits – created and maintained business models that attract, facilitate, and encourage the commercial sex market by providing a private and anonymous venue for traffickers and buyers alike.

123.  K.S.'s sex trafficking at the Knights Inn and the Motel 6 was a foreseeable and preventable result of Defendants failing to implement reasonable, appropriate, and adequate measures to deter sex trafficking at their hotels and failing to prevent K.S.'s continued victimization by ignoring her obvious, well-known signs and indicators of sex trafficking.

## TVPRA BENEFICIARY CLAIMS

124.  The TVPRA, 18 U.S.C. § 1595(a), provides a civil cause of action to victims like K.S. against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in" minor sex trafficking or forced labor sex trafficking.

125.  Defendants "knowingly benefited" from K.S.'s trafficking because:

   a.  K.S.'s trafficker and his associates rented rooms at the Knights Inn and Motel 6;

   b.  upon information and belief, K.S.'s trafficker and his associates used Defendants' WiFi networks at the Knights Inn and Motel 6; and

   c.  Defendants collected revenue from the room rentals and the use of the WiFi networks by K.S.'s trafficker and his associates.

126.    Defendants took part in a common undertaking involving risk or profit with K.S.'s trafficker because:

   a.  K.S., her trafficker, or his associates would pay in cash for one night at a time at the Knights Inn and Motel 6, booking the next night's stay before check-out time;

   b.  Defendants directly rented rooms to people it knew or should have known were engaged in sex trafficking, including the trafficking of K.S.;

   c.  Defendants were directly renting rooms to the same traffickers – K.S.'s traffickers;

   d.  Defendants rented rooms daily to K.S. when she was a minor without requesting proof of her identification as long as she provided the room key and cash;

   e.  Defendants knowingly and purposefully rented rooms to K.S.'s traffickers that were in locations at the Knights Inn and Motel 6 that allowed for more privacy and easier access and to make it more difficult for law enforcement to determine the illicit activity that was occurring;

   f.  Defendants Shiv Global and Global Management, knowing the purpose of K.S.'s and her trafficker's visit to the Knights Inn, were alerting K.S.'s trafficker when law enforcement was on the property;

   g.  Defendants Shiv Global and Global Management, knowing the purpose of K.S.'s and her trafficker's visit to the Knights Inn, were conveying messages to K.S. on behalf of her trafficker when law enforcement was on the property;

   h.  Defendants Hare Krishna and Global Management were violating their own policies and procedures by allowing johns to enter and pass

through the lobby of the Motel 6 without proof of identification or room rental to go to the room where K.S. was staying;

i. Defendants Hare Krishna and Global Management were violating their own policies and procedures by knowingly allowing guests to book under aliases;

j. Defendants owned, operated, and maintained the Motel 6 and the Knights Inn.

127. K.S.'s trafficker's undertaking with Defendants violated the TVPRA with respect to K.S. because:

a. the trafficker recruited K.S. to participate in commercial sex acts at the Knights Inn and the Motel 6 owned by Defendants;

b. the trafficker harbored K.S. at the Knights Inn and the Motel 6 owned by Defendants for the purpose of K.S. participating in commercial sex acts at the properties;

c. the trafficker transported K.S. to the Knights Inn and the Motel 6 owned by Defendants for the purpose of K.S. participating in commercial sex acts on the property;

d. the commercial sex acts occurred at Defendants' Knights Inn and Motel 6, within the rooms of the hotels that were rented by K.S.'s trafficker and his associates;

e. the trafficker used force, threats of force, fraud and coercion to cause K.S. to participate in commercial sex acts at Defendants' Knights Inn and Motel 6;

f. the trafficker threatened K.S. with violence and physically beat and raped her to cause K.S. to engage in commercial sex acts at Defendants' Knights Inn and Motel 6;

g. the trafficker knowingly recruited, enticed, harbored, transported, advertised, maintained, and solicited K.S. to engage in commercial

sex acts in the rooms at Defendants' Knights Inn and Motel 6 that the trafficker and his associates rented from Defendants;

h. buyers came to Defendants' Knights Inn and Motel 6, purchased the "right" to have sex with K.S. from her trafficker, and then the buyers raped K.S. at the Knights Inn and the Motel 6;

i. K.S.'s trafficker was aware that she was not yet 18 years old, but nevertheless, he sold her for commercial sex at the Knights Inn and the Motel 6; and

j. other actions to be proven at trial.

128. The venture in which Defendants participated affected interstate commerce for numerous reasons including the sale and use of condoms, the purchase of and use of cleaning supplies from out of state, the use of the internet to communicate, the use of interstate highways to transport K.S. to the Knights Inn and the Motel 6 by her trafficker (and his associates), and other reasons to be proven at trial.

129. As shown above, Defendants had – at minimum – constructive knowledge that K.S. was being trafficked for sex at the properties. *See* Fed. R. Civ. P. 9(b) ("knowledge and other conditions of a person's mind may be alleged generally); *Sun Life Assurance Co. of Can. v. Imperial Premium Fin.*, *LLC*, 904 F.3d 1198, 1215 (11th Cir. 2018) (same).

130. Defendants directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at their hotels, the Knights Inn and the Motel 6, at all relevant times, giving Defendants knowledge of

27

sex trafficking, including the sex trafficking that victimized K.S., and other crimes at the hotel during the relevant period.

**CAUSATION AND DAMAGES**

131. As a direct and proximate result of Defendants' acts and omissions, K.S. suffered substantial physical, emotional, and psychological harm and other damages.

132. Defendants are jointly and severally liable with K.S.'s trafficker, his associates, and any other non-party actors who participated in the trafficking for the indivisible injuries that the venture proximately caused to K.S.

133. K.S. brings each and every claim for damages permissible under the law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and punitive damages permissible under the law, including, but not limited to:

    a. personal injuries;

    b. past, present and future pain and suffering;

    c. disability;

    d. disfigurement;

    e. mental anguish;

    f. loss of the capacity for the enjoyment of life;

g. loss of earning capacity;

h. lost wages;

i. diminished capacity to labor;

j. incidental expenses;

k. past, present and future medical expenses;

l. permanent injuries;

m. attorneys' fees;

n. punitive damages; and

o. consequential damages to be proven at trial.

134. Punitive damages should be imposed upon Defendants without limitation or cap for its actions, which are explained more fully above.

135. Defendants are also liable for paying K.S.'s attorneys' fees and litigation expenses pursuant to the TVPRA and O.C.G.A. § 13-6-11 because Defendants have acted in bad faith in the underlying transaction as shown herein.

136. Each of the forgoing acts and omissions constitute an independent act of negligence on the part of the Defendants, and one or more or all of the above stated acts were the proximate causes of the injuries and damages sustained by K.S.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff K.S. prays for judgment against Defendants and for the following:

29

1) That process and summons issue requiring Defendants to appear as provided by law to answer the allegations of the Complaint;

2) Plaintiff be awarded actual damages in amounts to be shown at trial;

3) Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

4) Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

5) Punitive damages be imposed upon Defendants;

6) Plaintiff be provided with a trial by jury; and

7) Plaintiff receive such other relief as this Court deems just and appropriate under the circumstances.

This 12th day of March, 2026.

*/s/ Matthew B. Stoddard*
Matthew B. Stoddard
Ga. Bar No.: 558215
Carson L. Wynn
Ga. Bar No.: 672645
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
matt@legalhelpga.com
carson@legalhelpga.com